UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
LUCY CHOW and JOHN CHOW,

                       Plaintiffs,

    -against-

THE CITY OF NEW YORK and
SAM ROSADO,

                       Defendants.
----------------------------------------------------------------x

**MEMORANDUM AND ORDER**

**09-CV-1019 (BMC)**

**ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:**

      Currently pending before this Court, on a referral from the Honorable Brian M. Cogan, is an application by Michael B. Lumer and the law firm of Reibman & Weiner, former counsel to siblings Lucy Chow ("Ms. Chow") and John Chow ("Mr. Chow") (collectively, "the Chows" or "plaintiffs"), to enforce a charging lien for costs in the amount of $1,158 against $5,200 in settlement funds, which have not yet been disbursed by the defendant City of New York. Following an evidentiary hearing held on March 9, 2010, this Court ruled that Mr. Lumer and his firm had good cause to move to be relieved as counsel to the Chows and that therefore they had not forfeited their charging lien for costs. The Court further noted that an opinion would follow. See Minute Entry (March 9, 2010), ECF Docket Entry ("D.E.") #48. This Memorandum and Order constitutes that opinion.

## PROCEDURAL BACKGROUND

      On March 11, 2009, Mr. Lumer and his firm initiated this civil rights action on behalf of the Chows, arising out of their allegedly wrongful arrest for theft of services on the morning of March 18, 2006. See Compl., D.E. #1. The complaint alleges that on that date, plaintiffs

were arrested at a subway station for allegedly attempting to use their father's reduced fare Metro card, when in fact all they had attempted to do was determine the balance on, and possibly refill, that card. See id. ¶¶ 8-9.

On September 16, 2009, Mr. Lumer wrote to Judge Cogan, seeking permission to move to be relieved as counsel. See Letter Motion for Pre-Motion Conference (Sept. 16, 2009), D.E. #14. Two days later, Mr. Lumer filed an *ex parte* affidavit in support of that motion. See Declaration of Counsel In Support of the Motion to Be Relieved (Sept. 18, 2009), D.E. #16. The catalyst for Mr. Lumer's application was his recent discovery, through documents produced to him by defense counsel, that John and Lucy Chow had been arrested together on another occasion, i.e., on December 20, 2007, for criminal possession of stolen property and petit larceny -- charges that were dismissed in February 2009, after plaintiffs accepted Adjournments in Contemplation of Dismissal ("ACDs"). Id. ¶ 14. According to Mr. Lumer, this information was contrary to the Chows' statements to him at their initial consultation, contrary to the information they provided him in responding to defendants' interrogatories, and contrary to their sworn deposition testimony, in which they denied having been arrested on any other occasion. See id. ¶¶ 5, 11, 13.

In response to Mr. Lumer's application, Judge Cogan conducted an *ex parte* conference with the Chows and Mr. Lumer on September 21, 2009. See September 21, 2009 Transcript ("9/21/09 Tr."). At that conference, Mr. Lumer expressed "Rule 11 concerns" about continuing to represent the Chows. See id. at 5-6. In addition to the undisclosed arrests on December 20, 2007, he cited newly acquired information about a prior arrest of Lucy Chow for

2

theft of services, and a lawsuit resulting from that additional arrest. See id. at 6, 8. These credibility concerns now made him question whether, contrary to the Chows' statements to him, his clients had in fact used their father's Metro card to "double[] up" and go through the subway turnstile, as charged by the police. See id. at 5, 8.

At the conclusion of the September 21st *in camera* proceeding, Judge Cogan denied Mr. Lumer's request to be relieved. See id. at 10. In doing so, he posited that perhaps the Chows had been told by prior counsel that their arrests would be "expunged," see id. at 5, and the judge thus identified "a plausible explanation as to why they didn't tell you about this history" of arrests. Id. at 6. On the basis of that assumption, Judge Cogan declined to allow Mr. Lumer to withdraw: "[I]f indeed they didn't deliberately lie to [counsel]," this "communication error" would not warrant "abandoning a client . . . ." Id. at 7. The Chows, who were present throughout this proceeding, did nothing to clarify the reason for their failure to have disclosed their other arrests.

Following the *in camera* proceeding, Judge Cogan conducted an order-to-show-cause hearing in response to defense counsel's September 14th motion to compel discovery. See generally Motion to Compel (Sept. 14, 2009), D.E. #13. At the conclusion of that hearing, Judge Cogan issued an order directing plaintiffs to serve executed releases for the unsealing of records relating to their arrest histories, as well as telephone records and an authorization for telephone records; he also ordered plaintiffs' father, Frank Chow, to appear for his deposition in two days -- i.e., on September 23, 2009, at 1:00 p.m. See Minute Order (Sept. 21, 2009).

On October 5, 2009, Mr. Lumer again wrote to Judge Cogan, requesting a pre-motion

3

conference and permission to renew his firm's motion to be relieved. See Letter to Judge Cogan from Michael Lumer (Oct. 5, 2009), D.E. #20. He cited "the complete breakdown of the attorney-client relationship" and his inability "to comply with outstanding orders and deadlines." Id.

The following day, the Chows wrote to Judge Cogan, complaining about Mr. Lumer's failure to have promptly communicated to them the City's $2,000 Rule 68 offer of judgment, and Mr. Lumer's "belligerent" attitude towards them. See Letter to Judge Cogan from John and Lucy Chow (Oct. 6, 2009), D.E. #21. At a conference before Judge Cogan on October 13, 2009, Mr. Lumer expressed his belief that the case had no value, waived his right to fees, but reserved his right to seek reimbursement for costs. See October 13, 2009 Transcript ("10/13/09") Tr. at 2-6. Although the Chows voiced their grievances regarding Mr. Lumer's representation, they did not object to his withdrawal or respond to Judge Cogan's direct question as to whether they consented to his application. See id. at 1-2, 6-10. Judge Cogan nonetheless granted the motion on the ground that "the relationship between client and attorney is irretrievably broken . . . ." Id. at 9. Consistent with the rationale of Hallmark Capital Corp. v. Red Rose Collection, Inc., No. 96-CV-2839 (RPP)(AJP), 1997 WL 661146, at *3 (S.D.N.Y. Oct. 21, 1997), Judge Cogan did not determine who was at fault, and thus "made no ruling about entitlement to recovery of costs out of a potential settlement." 10/13/09 Tr. at 10.

Judge Cogan subsequently referred the case to the undersigned magistrate judge for all non-dispositive pretrial matters. See Referral Order (Oct. 23, 2010), D.E. #25. Thereafter, the parties filed various discovery-related requests, including defense counsel's motion to compel

4

the Chows (who were now proceeding *pro se*) to produce the releases previously ordered by Judge Cogan.  See Letter to the Court from Karl J. Ashanti (Nov. 13, 2009) at 2, D.E. #29.

On November 20, 2009, this Court conducted a conference to resolve the parties' discovery disputes.  At the conclusion of the proceeding, both sides agreed to settle the litigation for a payment of $2,600 to each plaintiff, inclusive of costs.  See Minute Entry (Nov. 20, 2009), D.E. #33.  After the parties filed their stipulation of discontinuance and the case was closed, see Stipulation of Discontinuance, D.E. #35, the Chows again wrote to Judge Cogan, objecting to Mr. Lumer's assertion of a charging lien for $1,158 in costs on the settlement proceeds.  See Letter to Judge Cogan from Lucy and John Chow (docketed Jan. 8, 2010), D.E. #36.  Judge Cogan referred their request to the undersigned magistrate judge.  See Order (Jan. 15, 2010), D.E. #37.

Following several telephone conferences and further submissions from Mr. Lumer and the Chows, the Court held an evidentiary hearing on March 9, 2010, to determine whether Mr. Lumer and his firm had good cause to terminate their representation of the Chows.  Prior to the taking of testimony, and again before the hearing concluded, Mr. Chow, on behalf of both plaintiffs, stated his "settlement" proposal on the record:  he and his sister would refrain from filing disciplinary charges against Mr. Lumer if Mr. Lumer agreed to waive his costs.  Mr. Lumer declined the offer.

The hearing testimony provided by Mr. Lumer was entirely credible and corroborated in significant part by documentary evidence.[1]  The Court credits his account of his discussions

---

[1] Seven exhibits, marked Lumer Exhibits C through I ("Lumer Ex. [letter]") were admitted
(continued…)

with the Chows and his reasons for seeking to be relieved. In contrast, John and Lucy Chow each gave testimony that not only conflicted with Mr. Lumer's version of events, but that was belied by contemporaneous documentation and circumstantial evidence. Simply put, the Court found their testimony to be patently perjurious in material respects.

## THE HEARING EVIDENCE

### I. Mr. Lumer's Testimony and Exhibits

Mr. Lumer, a civil rights attorney admitted to practice in May 1996, first met the Chows in February or March 2009, after Lucy Chow had contacted him -- shortly before the expiration of the statute of limitations -- about representing her and her brother in connection with their March 2006 arrests. The Chow siblings met with Mr. Lumer at his office. There they explained that they had walked to a subway station near their home to ascertain the balance on their father's "senior" Metro card; according to their story, the police officer who arrested them falsely claimed that they had "doubled up" and gone through the turnstile using their father's card. John Chow ultimately accepted an ACD and the charges against Lucy Chow were dismissed outright.

In response to specific questions from Mr. Lumer, the Chows assured him, in substance, that this was their only brush with the law; apart from this incident, they had never been arrested, handcuffed, or taken to a police precinct. When asked why they had waited so long to bring a lawsuit, they claimed that they had not realized that they could "do anything" about the

---

[1](…continued)
into evidence.

matter.[2]

On the basis of the information provided by the Chows, Mr. Lumer and his firm agreed to represent them, and they entered into retainer agreements. After the firm commenced litigation and caused the defendants to be served, Mr. Lumer spoke with the Chows in May 2009, in connection with his preparation of responses to the defendants' interrogatories. The Chows again confirmed that the arrests at issue were their only arrests. They later repeated these statements, under oath, at their depositions, in which they also described in detail the shame and humiliation that each allegedly suffered as a result of the March 2006 incident.

On August 31, 2009, defense counsel served Mr. Lumer with supplemental discovery, including documents reflecting that prior to their retention of Mr. Lumer's firm, both plaintiffs had been jointly arrested and charged with burglary. See Lumer Ex. E. Mr. Lumer telephoned the Chows and spoke first to Lucy, who continued to insist that she had never been arrested on any other occasion, even though Mr. Lumer made it clear that he was not limiting his question to arrests that resulted in convictions. Mr. Lumer then spoke with John Chow, who likewise falsely denied having been arrested at any other time. At some point in the conversation, Mr. Chow admitted that he had been the subject of another arrest, but he told Mr. Lumer that his lawyer had assured him that because of the disposition of the charge, it was "as if it never

---

[2] Mr. Lumer's account of the Chows' statements to him is entirety consistent with his contemporaneous notes of that meeting. See Lumer Ex. I. The Chows suggested that the notes were a recent fabrication. Significantly, however, Mr. Lumer did not offer his notes as corroboration. Rather, after the Chows testified, the Court inquired of Mr. Lumer whether he had taken notes of the meeting and whether he had them with him in his file. Only then did he produce the notes, which reflect, among other things: "DID NO[T] GO THRU TURNSTYLE" [sic], "LC . . . never arrested," "JC . . . arrested: never." Lumer Ex. I.

happened." As further justification for this withholding of information, Mr. Chow explained that if he and his sister had revealed that information earlier, Mr. Lumer "wouldn't have taken the case."

Understandably disturbed by these revelations, Mr. Lumer and his firm began to consider whether to move to withdraw from the case. They disbelieved the Chows' "innocent" explanation for their misstatements, and felt that plaintiffs had intentionally concealed their prior arrests. They now had serious concerns about the veracity of the Chows' account of the events surrounding their March 2006 arrests.

In the meantime, defendants moved for an order to compel the deposition of the Chows' father, Frank Chow, and the production of authorizations relating, among other things, to plaintiffs' criminal histories[3] and phone records. On September 14, 2009, after Judge Cogan issued an order to show cause, Mr. Lumer responded to the City's motion and also indicated his firm's intention to move to withdraw. Several days later, Mr. Lumer filed an *ex parte* application explaining his concerns about his continued representation of plaintiffs, and he served copies on the Chows. At the conference before Judge Cogan on September 21, 2009, Judge Cogan denied Mr. Lumer's application to withdraw, directed the Chows to execute and serve the demanded authorizations, and ordered Frank Chow to appear for deposition on September 23, at 1:00 p.m.

---

[3] Defendants' motion to compel noted that Lucy Chow had been arrested on yet another occasion, for improperly using her mother's disability card, and had initiated and settled a corresponding civil rights action in the Southern District of New York. See Motion to Compel (Sept. 14, 2010) at 2, D.E. #13; see also Lumer Ex. F (S.D.N.Y. complaint and stipulation of discontinuance).

The following evening, at 8:42 p.m., defense counsel emailed Mr. Lumer and communicated Rule 68 offers of judgment of $1,001 plus attorney's fees for each plaintiff. See Lumer Ex. J.[4] The next day, in the waiting room at defense counsel's office, Mr. Lumer met with the Chows and their father at around 12:45 p.m. or 12:50 p.m. While waiting for the deposition to begin, Mr. Lumer discussed the upcoming examination with Frank Chow. He did not speak with plaintiffs about the Rule 68 offers until after Frank Chow's deposition was completed. In his hearing testimony, Mr. Lumer cited two plausible reasons for deferring that discussion until later in the day: First, given that the court-ordered deposition was scheduled to begin at 1:00 p.m., he did not believe that he had sufficient time to provide an uninterrupted (and somewhat complicated) explanation of the ramifications of such an offer.[5] Second, because Judge Cogan had ordered that the deposition be conducted that afternoon, Mr. Lumer felt that it would not be appropriate to adjourn it while settlement efforts proceeded.

About 4:00 or 5:00 p.m., after the Frank Chow deposition concluded, Mr. Lumer advised plaintiffs about the Rule 68 offers and the legal implications of those offers. He also told them that he believed that their case had no value and that he did not feel comfortable going forward with the litigation. Plaintiffs responded that they wanted to think about the Rule 68 offers.

After cancelling an earlier meeting with counsel, plaintiffs and Frank Chow appeared at

---

[4] Although Lumer Exhibit J references only the Rule 68 offer of judgment as to Lucy Chow, it is undisputed that defendants made a similar offer as to John Chow.

[5] As it turned out, defense counsel did not commence the deposition until shortly before 2:00 p.m. However, Mr. Lumer had no advance notice as to the delay, and did not want to begin his Rule 68 discussion and have it abruptly aborted by the appearance of defense counsel.

9

Mr. Lumer's office on September 30, 2009, and said they would accept a total of $3,000 to settle the case -- $1,000 for each plaintiff and $1,000 for their father, for having been subjected to a deposition. Because of his concerns about the Chows' credibility, Mr. Lumer did not want to initiate settlement discussions with the City absent written authorization from the Chows. He therefore prepared a document confirming that they had authorized him to settle the case for $3,000. See Lumer Ex. H.[6] They refused to sign it. He then advised them that, if they wanted to pursue their claims, they would have to sign the authorizations that Judge Cogan had previously ordered them to produce. They replied that they would not sign anything that he presented to them, and they disclosed that they had already communicated with Judge Cogan, who they said knew nothing about the Rule 68 offers of judgment.

The meeting ended. Mr. Lumer thereafter applied for a pre-motion conference and permission to renew his firm's motion to be relieved. The firm agreed to waive its fees, but expressly declined to waive its costs, which aggregated $1,158: to wit, the court filing fee of $350; service costs of $110 (Lumer Ex. C); deposition transcript cost of $663 (Lumer Ex. D); and postage and UPS costs of $35.

## II. The Chows' Testimony

John and Lucy Chow testified at the hearing, and each provided similar -- and similarly incredible -- testimony that was refuted by the testimony of Michael Lumer and the documentary evidence introduced at the hearing. They each claimed that when they first met

---

[6] At the hearing, both Chows falsely claimed that at the September 30th meeting, Mr. Lumer had insisted that they settle for $2,000, and had presented them with a document authorizing him to settle for $2,000, with a notation of "$3,000" on the reverse side.

with Mr. Lumer (and his partner) at the firm's office, they disclosed their other arrests and Lucy Chow's prior civil rights lawsuit. Remarkably, although each had given sworn testimony at their depositions denying that either had utilized their father's Metro card on the morning of their arrests,[7] the Chows asserted at the hearing that John Chow had "swiped" the card but Lucy had not. According to the Chows, Mr. Lumer and his partner had advised them not to disclose their other arrests or the prior lawsuit, had coached them to testify falsely at their depositions, and had come up with the "idea" that they had traveled to the subway station on March 18, 2006, to check the balance on their father's card.[8]

In describing the *in camera* proceeding before Judge Cogan on September 21, 2009, at which Mr. Lumer complained to the Court that his clients had not disclosed to him their arrest histories, the Chows claimed that they had not been paying close attention to what was said, and/or were too nervous to correct the record; incredibly, John Chow -- a college graduate who used the term "skullduggery" during his testimony -- averred that he did not understand what the word "relieved" meant.

Similarly implausible is the Chows' account of the events of September 23, 2009. According to their testimony at the hearing, before their father's deposition commenced, they asked Mr. Lumer whether the City had offered any money to settle the case, and Mr. Lumer

---

[7] Their deposition testimony was belied by evidence subsequently disclosed by defense counsel: according to the fare-card history of Frank Chow's confiscated Metro card, the card had been used immediately prior to plaintiffs' arrests on March 18, 2006. See 10/13/09 Tr. at 13; Motion for Summary Judgment, Ex. I, D.E. #30-1 p. 45.

[8] Contrary to the premise of this "theory," Frank Chow's card was a one-month pass that allowed him unlimited use for that period of time.

responded "no," adding that "this case is worth nothing." Mr. Lumer then went to the bathroom, and his clients could hear him "yelling and screaming" on his cellphone about getting more fees; they could tell that he was talking with defense counsel, because both attorneys then appeared in the waiting room and, following the deposition, the two men were talking and laughing together in a suspicious manner.

On September 29, 2009, after Mr. Lumer advised them of and urged them to accept the City's offer to pay each $1,000 plus fees, the Chows traveled to the courthouse and expressed to Judge Cogan's clerk their concern that Mr. Lumer was acting unethically. The clerk checked his computer and saw nothing to indicate a settlement offer. He suggested that plaintiffs write to the judge.

The following day, the Chows met with Mr. Lumer, who they claim insisted that they settle for $2,000, "flew into a rage" when they refused, and called them "imbeciles." He "might have" "mumbled" something about signing other papers. When the Chows revealed that they had talked with Judge Cogan's clerk, Mr. Lumer and his partner threw them out of the office.

## **DISCUSSION**

As demonstrated by the credible evidence adduced at the hearing, Mr. Lumer and his firm were amply justified in seeking to be relieved of their representation of the Chows. First, they had well-founded concerns that their clients had intentionally lied to them, had perjured themselves in their deposition testimony, and were advancing baseless claims founded on a fabricated account of the events surrounding their arrests. Second, by the time Mr. Lumer renewed his request to be relieved, the Chows had made clear that they would not execute the

12

authorizations that Judge Cogan had ordered them to produce, nor would they otherwise cooperate with Mr. Lumer and his firm. The termination of the attorney-client relationship thus was the product of misconduct by the Chows, not by counsel. Accordingly, as discussed below, Mr. Lumer did not forfeit his charging lien for costs.

### A. Governing Legal Principles

"New York Judiciary Law § 475. . . governs attorneys' charging liens in federal courts sitting in New York." Itar-Tass Russian New Agency v. Russian Kurier, Inc., 140 F.3d 442, 448-49 (2d Cir. 1998) (citing cases). "[T]he Second Circuit has 'long recognized that the lien created by section 475 . . . is enforceable in federal courts in accordance with its interpretation by New York courts." Id. at 449 (collecting cases and quoting In re Chesley v. Union Carbide Corp., 927 F.2d 60, 67 (2d Cir. 1991)). Section 475 reads in pertinent part:

> From the commencement of an action, . . . in any court . . ., the attorney who appears for a party has a lien upon his client's cause of action, . . . which attaches to a verdict, report, determination, decision, judgment or final order in his client's favor, and the proceeds thereof in whatever hands they may come; and the lien cannot be affected by any settlement between the parties before or after judgment, final order or determination. The court upon the petition of the client or attorney may determine and enforce the lien.

N.Y. Judiciary Law § 475.

"[A]ttorneys who terminate their representation are still entitled to enforce their charging liens, as long as the attorney does not withdraw without 'good cause' and is not discharged for 'good cause.'" Melnick v. Press, No. 06-CV-6686 (JFB)(ARL), 2009 WL 2824586, at *2 (E.D.N.Y. Aug. 28, 2009) (collecting cases). In fact, New York's highest court has declared that "where an attorney's representation terminates and there has been no misconduct, no discharge for just cause and no unjustified abandonment by the attorney, the

13

attorney's right to enforce the statutory charging lien is preserved . . . ." Klein v. Eubank, 87 N.Y.2d 459, 464 (1996). Federal courts in this circuit have adhered to that principle:

> Where there is no evidence of misconduct, no discharge for cause, and no "abandonment" by the attorney, the New York Court of Appeals has held that "[a] rule making the charging lien unavailable to attorneys who voluntarily withdraw would introduce a strong economic deterrent" to the amicable settlement of these fee disputes and "rather than encouraging attorneys to bow out graciously," the rule would provide an incentive to the attorney to stay on in order to protect his right to fees.

Louima v. City of New York, No. 98-CV-5083 (SJ), 2004 WL 2359943, at *60 (E.D.N.Y. Oct. 18, 2004) (quoting Klein, 87 N.Y.2d at 463-64); accord Lansky v. Easow, 756 N.Y.S.2d 885, 885-886 (2d Dep't 2003) (reversing trial court's conclusion that attorney withdrew without sufficient cause).

"A hearing is required to determine if [an attorney] was discharged for cause . . . ." Mason v. City of New York, 889 N.Y.S.2d 24, 25 (1st Dep't 2009). In that connection, "[t]he burden of proving that a termination is for cause is on the client." Cruz v. Olympia Trails Bus Co., No. 99 Civ. 10861 (JSR)(HBP), 2003 WL 342278, at *3 (S.D.N.Y. Feb. 14, 2003) (citing Casper v. Lew Lieberbaum & Co., No. 97 Civ. 3016 (JGK)(RLE), 1999 WL 335334, at *6 (S.D.N.Y. May 26, 1999)), vacated on other grounds, Budin, Reisman, Kupferberg & Bernstein, LLP. v. Law Offices of Rosemarie Arnold, 79 F.App'x 460 (2d Cir. 2003).

### B. Good Cause

In this case, regardless of who hears the burden of proof, the Court concludes that Mr. Lumer and his firm acted entirely properly and with ample justification in seeking to withdraw from the case. In New York, counsel's ethical obligations are set forth in the Rules of

Professional Conduct and its predecessor, the Model Code of Professional Responsibility.[9] Although each of those codes "was drafted solely for its use in disciplinary proceedings and cannot by itself serve as a basis for granting a motion to withdraw as counsel," the Second Circuit has stated that they "provides guidance for the court as to what constitutes 'good cause' to grant leave to withdraw as counsel." Whiting v. Lacara, 187 F.3d 317, 321(2d Cir. 1999); accord Joseph Brenner Assocs. v. Starmaker Entm't, Inc., 82 F.3d 55, 57 (2d Cir. 1996) (citing New York's implementation of the Model Code in affirming district court's decision granting counsel's withdrawal motion); DeFlumer v. LeSchack & Grodensky, P.C., No. 99-CV-1650(NAM/DRH), 2000 WL 654608, at *1 (N.D.N.Y. May 19, 2000) ("[A]n attorney's withdrawal from representation of a client is governed by the American Bar Association Model Code of Professional Responsibility"); Brown v. Nat'l Survival Games, Inc., No. 91-CV-221, 1994 WL 660533, at *4 n.1 (N.D.N.Y. Nov. 18, 1994) (citing Armstrong v. McAlpin, 625 F.2d 433, 446 n.26 (2d Cir. 1980), vacated on other grounds, 449 U.S. 1106 (1981)).

The Chows would have this Court believe that Mr. Lumer sought to withdraw because plaintiffs refused to accept defendants' Rule 68 offers and because they complained to Judge Cogan about his alleged misconduct. To be sure, "[u]nder New York law, the refusal of a client to accept a settlement offer is not good and sufficient cause for the withdrawal of the attorney." Cosgrove v. Federal Home Loan Bank, 90 Civ. 6455 & 92 Civ. 4225, 1995 WL

---

[9] See 22 N.Y. Comp. Codes R. & Regs. tit. 22, § 603.2 (defining "professional misconduct" in conformity with Rules of Professional Conduct with respect to conduct on or after April 2, 2009, and in conformity with the disciplinary rules of the former Code of Professional Responsibility, with respect to conduct on or before March 31, 2009).

600565 at *2 (S.D.N.Y. Oct.12, 1995); accord Marrero v. Christiano, 575 F.Supp. 837, 839 (S.D.N.Y. 1983). Similarly, "the fact that a lawsuit is of questionable liability, limited damages, and a likely unfavorable trial result is not the type of impairment of the attorney-client relationship that permits withdrawal of counsel." Countryman v. Watertown Hous. Auth., 820 N.Y.S.2d 757 (Sup. Ct. Jefferson County 2006). Nevertheless, as a matter of fact, the Court rejects the Chows' attribution of an improper motive to counsel's request to be relieved.[10] Furthermore, courts have distinguished between withdrawals based on counsel's assessment that the client is unlikely to prevail and those based on counsel's belief that the claims are baseless:

> [C]ounsel should not be relieved merely because he believes his client's case is weaker than he had thought when he took the case in the first place. The possibility that a client's case appears less meritorious during the litigation is a risk that an attorney takes when he agrees to represent the client. Still, an attorney may be entitled to withdraw if he believes that his client's case is so lacking in merit that he cannot, in good faith, present the client's case to the court.

Vaughn v. Am. Tel. & Tel. Corp., No., 96 Civ.0989(LAK), 1998 WL 760230, at *1 (S.D.N.Y. Oct. 30, 1998) (collecting cases) (granting motion to be relieved).

Consistent with this principle, in Foster v. City of New York, No. 96 Civ. 9271(PKL), 2000 WL 145927 (S.D.N.Y. Feb. 07, 2000), the court found good cause for counsel's withdrawal where "requiring [counsel] to oppose defendant's motion would force him to advance arguments before this Court that he believes are frivolous." Id. at *4. The court agreed that "[a]n attorney should be permitted to withdraw if he believes his client's case is so lacking in merit that he cannot present it in good faith." Id. "Once a legitimate prospect of

---

[10] Notably, the firm first sought to be relieved *before* the City's Rule 68 offers of judgment.

16

Rule 11 sanctions comes into play, leave to withdraw must be granted." Id.

Here, as in Foster, counsel's sincere and well-founded concern about Rule 11 sanctions established good cause for the firm's withdrawal. The Chows had concealed from counsel information about their criminal records and litigation history, and had acknowledged their belief that the firm would have declined their representation had they disclosed those facts. The firm was thus justified in questioning the credibility of the Chows' account of the facts surrounding their arrests.

Furthermore, the Chows' subsequent refusal to execute the authorizations ordered by Judge Cogan constituted yet another basis for the firm to withdraw. "[T]he Code of Professional Responsibility advises counsel to withdraw from representation where the client's conduct makes effective representation unreasonably difficult." Furlow v. City of New York, 90 Civ. 3956, 1993 WL 88260 at *2 (S.D.N.Y. March 22, 1993). In addition, plaintiffs' unjustified complaints to Judge Cogan's staff about Mr. Lumer's alleged misconduct compounded the firm's difficulties in continuing to represent them.[11] The law is clear that where there has been a breach of trust on the part of the client or a challenge to the attorney's loyalty, the attorney should be permitted to withdraw. See Hunkins v. Lake Placid Vacation Corp., 508 N.Y.S.2d 335, 337 (3d Dep't 1986); In re Meyers, 120 B.R. 751, 752 n.2 (Bankr. S.D.N.Y. 1990).

Simply put, the blame for the breakdown in the attorney-client relationship lies squarely

---

[11] Having heard the testimony and observed the witnesses at the hearing, the Court is convinced that the Chows, who knew of Mr. Lumer's desire to be relieved and Judge Cogan's comments at the September 21st *ex parte* hearing, orchestrated the trip to the courthouse as a pre-emptive strike to prevent Mr. Lumer's firm from enforcing its lien.

17

with the Chows and their own misconduct, perjury, and other manipulations. Therefore, Mr. Lumer and his firm in no way forfeited their charging lien for costs reasonably and actually incurred, in the amount of $1,158.

## **CONCLUSION**

For the foregoing reasons, the Court rules that Mr. Lumer and his firm are entitled to enforce their charging lien for $1,158 against the settlement proceeds.

Any objection to the recommendations contained in this Memorandum and Order must be filed with the Honorable Brian M. Cogan on or before **March 29, 2010**. Failure to file objections in a timely manner may waive a right to appeal the District Court order.

The Clerk is directed to enter this Memorandum and Order into the ECF system and to transmit copies, via Federal Express, to Mr. Lumer and each of the Chows.

**SO ORDERED.**

**Dated:  Brooklyn, New York
March 12, 2010**

ROANNE L. MANN
UNITED STATES MAGISTRATE JUDGE